## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Sherri Queener, being duly sworn and appointed as a Special Agent of the Federal Bureau of Investigation, hereby make the following statement, based on information obtained by myself, other Special Agents of the Federal Bureau of Investigation, and the District of Columbia Department of Insurance, Securities and Banking.

1.      This Affidavit is made in support of search and seizure warrant for the premises known as **DC Dentistry,  1712 I Street NW, Suite 910, Washington, D.C**.  The premises to be searched is further described in Attachment A of this Affidavit.  The evidence, fruits, and instrumentalities believed to be located within the premises are set forth on Attachment B.

2.      Your Affiant has been employed by the Federal Bureau of Investigation since October 5, 2003.  Your Affiant has training in the enforcement of laws of the United States, including training in the preparation, presentation, service and execution of criminal complaints and arrest and search warrants.  Your Affiant is currently assigned to the Health Care Fraud Squad CR-19, of the Federal Bureau of Investigation, Washington Field Office, Northern Virginia Resident Agency.  Your Affiant's duties include, but are not limited to, investigations in the District of Columbia of health care fraud, mail and wire fraud, money laundering and false statements and false claims.  The facts and information contained in this affidavit are based upon my personal knowledge of this investigation and the information conveyed to me by other Special Agents of the FBI and investigators of the District of Columbia Department of Insurance, Securities and Banking who are involved in this investigation.  The information in this affidavit does not include each and every fact known to the government, rather it only includes the information to prove that probable cause exists for a search warrant to be issued for the below identified and

described location, for evidence of violations of Title 18, United States Code, Section 1035 (False Statements Relating to Health Care Matters) and Title 18, United States Code, Section 1956(a)(1) (money laundering).

## CORPORATION INFORMATION

3. DC Dentistry was incorporated on or about August 8, 1997 by **Afsaneh Tehrani** (Tehrani). DC Dentistry is owned and operated by Tehrani. Although not a dentist, Tehrani is responsible for making appointments, collecting payments from patients, billing private insurance companies for services, paying the company bills and payroll and hiring and firing employees, including the dentists. Tehrani is the only individual who handles the insurance claims.

4. In a two-year report for foreign and domestic business corporations, in the District of Columbia, dated April 11, 2004, Tehrani lists herself as Director, President, Vice President, Secretary and Treasurer of DC Dentistry. The report is signed by A. Tehrani.

5. DC Dentistry does not participate in federal health care programs and only takes private insurance plans as payment for services rendered. DC Dentistry does not take HMO insurance plans.

6. Dentists employed at DC Dentistry are hired on a contract basis.

## COOPERATING WITNESS INFORMATION

7. On or about February 17, 2005, your Affiant received information from District of Columbia Department of Health (DOH) Investigators regarding complaints made by patients of DC Dentistry. Patients filed complaints that they had been billed for services not rendered.

8. Cooperating witness #1 (CW1) was called by Tehrani and advised that everyone from

CW1's office was a patient of DC Dentistry. CW1 visited DC Dentistry for his/her first appointment. Although he/she never gave anyone his/her insurance card, CW1 discovered that Tehrani already had his/her Humana insurance number. CW1 visited DC Dentistry on several occasions. CW1 told Tehrani that he/she was worried about the cost of certain procedures. Tehrani told CW1 to not worry about it, that his/her insurance company would cover it. CW1 later received a bill from DC Dentistry that amounted to over $5,000.00. CW1 also discovered that from November 26, 2002 to December 20, 2002, Humana Insurance Company was billed for services not rendered which included a root canal and 21 resin fillings. CW1 advised that he/she did not get more than four fillings in his/her teeth. In 2003, CW1's insurance company changed to MAMSI. CW1 never used the insurance coverage with MAMSI. In late 2003 or early 2004, however, CW1 received two checks from MAMSI for reimbursement for services rendered even though he/she never used the coverage. CW1 forwarded the payment to DC Dentistry. The services that DC Dentistry billed MAMSI are as follows:

| Date of Service | Procedure | Tooth |
|---|---|---|
| 10/14/03 | Oral Examination | |
| 10/14/03 | X-ray | |
| 10/14/03 | Root Canal | 14 |
| 10/28/03 | Porcelain Crown, Post & Pin | 14 |
| 1/28/04 | Porcelain Crown, Post & Pin | 3 |
| 1/17/04 | Porcelain Crown, Post & Pin | 10 |

CW1 advised that he/she did not visit DC Dentistry in October of 2003 or January of 2004.

9.      Cooperating witness #2 (CW2) was referred to DC Dentistry by his/her boss. CW2 first went to DC Dentistry to have his/her teeth cleaned. CW2 continued to visit DC Dentistry every six months to have his/her teeth cleaned. The last time CW2 went to DC Dentistry was in May

of 2004. Sometime after CW2's last appointment at DC Dentistry, he/she received a bill for more than $6,000. The bill included services that were never rendered to CW2 including fillings/restorations and resins. Claims were sent to CW2's insurance company for the following:

| Date of Service | Procedure | Tooth |
|---|---|---|
| 11/22/02 | Resin | 18 |
| 11/22/02 | Resin | 19 |
| 11/23/02 | Resin | 3 |
| 11/23/02 | Resin | 4 |
| 11/23/02 | Resin | 30 |
| 11/23/02 | Resin | 31 |
| 11/30/02 | Resin | 12 |
| 11/30/02 | Resin | 13 |
| 11/30/02 | Resin | 14 |
| 11/30/02 | Resin | 15 |
| 12/10/02 | Resin | 6 |
| 12/10/02 | Resin | 7 |
| 12/10/02 | Resin | 8 |
| 12/10/02 | Resin | 9 |
| 12/10/02 | Resin | 10 |

CW2's insurance company paid DC Dentistry more than $1,500.00 for these services. CW2 has never received any services other than teeth cleanings from DC Dentistry. CW2 never paid a co-payment to DC Dentistry as Tehrani always told CW2 to not worry about it.

10.     Cooperating Witness #3 (CW3) was referred to DC Dentistry by a friend. CW3's first visit to DC Dentistry was on or about February 28, 2004. CW3 made two appointments on that day, one for his/her spouse and one for his/her child. On or about February 28, 2004, Tehrani realized that CW3 did not have an appointment and encouraged him/her to get x-rays taken on that date in order to shorten the length of future appointments. CW3 only had the x-rays taken on that day. A review of CW3's insurance explanation of benefits (EOB) dated July 19, 2004 revealed that CW3's insurance company was billed for x-rays, an oral exam, adult cleaning and

fluoride treatment. Tehrani urged the entire family to utilize their insurance benefits and get as many procedures done as allowable by their respective plans. Tehrani suggested that they each get implants, braces and various other procedures. Approximately one week later, Tehrani contacted CW3 and asked him/her to visit DC Dentistry for a free consultation with one of the dentists regarding further procedures.

11.  On or about March 17, 2004, CW3 visited DC Dentistry for a consultation and was told that he/she needed braces. A review of CW3's EOB dated July 19, 2004, revealed that CW3's insurance company was charged $250 for the consultation which he/she was told by Tehrani would be free.

12.  On or about April 17, 2004, CW3 visited DC Dentistry and had a cast taken of his/her teeth. A review of CW3's insurance EOB dated February 8, 2005, revealed that CW3's insurance company was charged $250 for "full mouth x-rays," which CW3 advised that she did not have taken on that date.

13.  On or about April 20, 2004, CW3 visited DC Dentistry and received fillings in two of his/her teeth. A review of CW3's insurance EOB revealed that CW3's insurance company was billed for fillings in three teeth for April 20, 2004.

14.  Cooperating witness #4 (CW4) worked at DC Dentistry as a dentist from April 2003 until December of 2004. CW4 would see patients assigned to him/her by Tehrani. CW4 would determine a treatment plan for the patient and then give it to Tehrani. Tehrani would then discuss the financing and insurance issues alone with the patient. CW4 has overheard Tehrani telling patients "don't worry about it" in regards to the patients bills or insurance coverage. CW4 advised that Tehrani would use the phrase frequently. CW4 also advised that Tehrani tried to

push CW4 to do unnecessary procedures.

15.     CW4 is aware of a situation where Metlife Insurance Company contacted Tehrani regarding a beneficiary complaint. Metlife had been billed for services that were never rendered by DC Dentistry. Tehrani told Metlife that she billed the entire treatment plan for the beneficiary by accident and in turn reimbursed Metlife for the overpayment.

16.     CW4 advised that Tehrani would complain that, although patients did not pay their co-payments, Tehrani did not ask patients to pay the co-payments.

17.     Prior to leaving DC Dentistry, CW4 noticed that some patient charts were blank and were missing the patient history sheets. CW4 noticed that the charts that he/she had been using were gone and seemed to disappear overnight.

18.     According to Cigna Insurance Company, a typed written complaint was received that read as follows:

> "Fraud Department
>  Bad office in Washington
>
> Hey, I worked with these people in a dentist office in Washington and they were cheating all the insurance companys of the pateints they saw. Afsani Terani is the owner of the office of DC Dentistry, and shes not even a dentist. The place is at 1712 I St NW Washington DC 20006 She overcharge all the insurance companys when the people have good insurance, and also don't collect the co-payment so it cost the people less money and sometimes they don't even do the work.
>
> It's not fair so I think you should know."

The complaint is signed Maria.

Cigna in unsure as to when the complaint was received or by what manner. Your Affiant interviewed four former workers of DC Dentistry but has not been able to determine whether Maria is a true name.

6

**CLAIMS DATA AND FINANCIAL INFORMATION**

19. Through a request to the National Health Care Anti-Fraud Association, your Affiant determined that DC Dentistry filed dental claim forms to private insurance companies for services rendered. Your Affiant has analyzed some, but not all, claims that DC Dentistry has submitted to various different private insurance companies.

20. A review of claims data from Humana Insurance Company revealed that during the time period of October 23, 2002 until February 6, 2003, DC Dentistry billed $109,575.00 to Humana for 504 different services rendered. As a result, DC Dentistry was paid $41,326.70. The claims represented 18 beneficiaries within seven different households who all were listed under the group name of Copyright Printing. The manager of Copyright Printing, Solomon Belay, was interviewed regarding DC Dentistry. Mr. Belay told investigators that only three of his employees had been offered health care coverage. Mr. Belay also said that he had not had any dealings with DC Dentistry. A review of claims data revealed that DC Dentistry submitted 39 separate claims for services provided to Mr. Belay for the time period of October 10, 2002 through November 26, 2002.

21. An analysis of claims data reveals that the following insurance companies paid claims submitted by DC Dentistry:

| Insurance Company | Paid Claims | Submitted Claims |
|---|---|---|
| Humana Insurance | $51,704.30 | $135,920.00 |
| Care First Blue Cross Blue Shield | $132,109.86 | $525,354.14 |
| Cigna Insurance Company | $485,783.53 | $989,158.75 |
| United Concordia Insurance Company | $50,019.05 | $109,945.50 |
| **Total** | **$719,616.74** | **$1,760,378.39** |

22. An analysis of bank records for DC Dentistry revealed the following deposit information for 2001 through 2004:

| Year | Deposit Amount |
|---|---|
| 2001 | $1,336,223.89 |
| 2002 | $1,307,455.93 |
| 2003 | $1,381,162.80 |
| 2004 | $892,502,75 |
| **Total** | **$4,917,345.37** |

23. In "Employers Quarterly Contribution and Wage Reports" obtained for the District of Columbia Department of Employment Services Unemployment Compensation Division, the following is listed as Tehrani's gross wages for 2004:

| Quarter Ending | Gross Wages |
|---|---|
| March 31, 2004 | $36,930.00 |
| June 30, 2004 | $43,085.00 |
| September 30, 2004 | $36,930.00 |
| December 31, 2004 | $137,486.70 |
| **Total** | **$254,431.70** |

24. Checks written to Tehrani, by Tehrani, on the DC Dentistry bank account amounted to the following during 2004:

| Quarter Ending | Amount |
|---|---|
| March 31, 2004 | $117,323.17 |
| June 30, 2004 | $148,381.69 |
| September 30, 2004 | $42,690.00 |
| December 31, 2004 | $30,610.32 |
| **Total** | **$339,005.20** |

25. From January 3, 2001 through May 26, 2005, checks written to Tehrani, by Tehrani, amounted to approximately $2,014,663.95. Each check is signed A. Tehrani.

## CONCLUSION

26. For the reasons stated herein, your Affiant has probable cause to believe that within the

premises known as DC Dentistry Inc., 1712 I Street NW, Suite 910, Washington, D.C., as described in Attachment A, there are presently items specified in Attachment B which constitute fruits, evidence and instrumentalities of violations of Title 18, United States Code, Section 1035 (False Statements Relating to Health Care Matters), and Title 18, United States Code, Section 1956(a)(1) (Money Laundering).

I swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

_____
Sherri Queener, Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me on this_____day of October, 2005.

_____
United States Magistrate Judge

**ATTACHMENT A**

<u>Description of 1712 I Street NW, Suite 910, Washington, D.C.</u>

This address is a commercial office building that is white stone/concrete. The building consists of ten floors and a basement. "1712" is prominently displayed on the front of the building. The Art Gallery Grill is located in the same building at the street level. The building has a street level entrance with a small lobby that holds two elevator banks. DC Dentistry is located on the 9th floor. A small plate is located next to the door of DC Dentistry which reads "910 DC Dentistry Inc.". The marquee in the lobby of the building lists DC Dentistry and Afsaneh Tehrani in Suite 910.

## ATTACHMENT B

## ITEMS TO BE SEIZED

Based on the facts as are recited in the attached affidavit, your Affiant has probable cause to believe the following records are located at the above premises, and contain evidence of the crimes described in the affidavit.

The terms "records," "documents," and "materials" include all of the foregoing items of evidence in whatever form and by whatever means such records, documents or materials, their drafts, or their modifications may have been created and stored, including, but not limited to, any handmade form (such as writing or drawing with any implement on any surface, directly or indirectly); any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies); any mechanical form (such as phonograph records, printing or typing); and any electrical, electronic or magnetic form (such as tape recordings, cassettes, compact discs or any information on an electronic or magnetic storage device, such as floppy diskettes, hard disks, CD-ROMs, optical discs, printer buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives or electronic notebook, as well as printouts or readouts from any magnetic storage device).

Items subject to search and seizure are as follows:

1)   Any and all patient files and/or dossiers, notes, insurance claim forms, bills, receipts, billing records, purchase records, correspondence, contracts/agreements, appointment books/calendars, business cards, notes, ledgers, employee/employer documents, manual or electronic telephone directories and their contents, complaint letters/forms/notes, prescription records, signature stamps, licenses pertaining to the practice of medicine and, correspondence

to/from the Department of Health, Board of Dentistry, or private insurance agencies.

2) Any literature pertaining to billing, medical coding or diagnosis.

3) Any and all bank statements and records, money drafts, money orders, letters of credit, cashiers' checks, safe deposit keys, statements of accounts, return and/or canceled checks, checkbooks and stubs, duplicate and copies of checks, deposit items, savings passbooks, loan documents and similar bank and financial accounts or other financial records, tax documents and filings. These records would include evidence of the bank accounts listed in the affidavit as well as other accounts in the subjects and business names in the affidavit.

4) Any and all notes, markings, documents, papers, folders, photographs, paper scraps, and partial documents relating to the names and business listed in the affidavit herein.

5) Any and all contracts, correspondence, notes, agreements, and other documentation pertaining to the names and businesses listed in the affidavit herein.

<u>Computer-related items subject to search and seizure are as follows</u>:

To effectuate the search and to the extent necessary to retrieve documents identified in the affidavit which may be stored electronically, the following items will be seized as needed:

6) <u>Hardware</u>

Computer hardware consisting of all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes (but is not limited to) any data-processing devices (such as central processing units, memory typewriters, and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, transistor-like

binary devices and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communications devices (such as modems, cables and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

7) <u>Documentation</u>

Computer-related documentation consisting of written, recorded, printed or electronically stored material which explains or illustrates how to configure or use the computer hardware, software or other related items.

8) <u>Software</u>

Computer software is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, optical or other digital form. It commonly includes programs to run operating systems, applications (like word-processing, graphics or spreadsheet programs), utilities, compilers, interpreters and communication programs.

9) <u>Passwords and Date Security Devices</u>

Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation or data. Data security devices may consist of hardware, software or other programming code. A password (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security

hardware may include encryption devices, chips and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make inaccessible or unusable, as well as reverse the process to restore it.